# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David W. McKeague | Sitting Judge if Other than Assigned Judge | Ian H. Levin |
|---|---|---|---|
| **CASE NUMBER** | 99 C 1959 - ~~00 C 171~~ | **DATE** | 11/5/2001 |
| **CASE TITLE** | Jones vs. Scientific Colors Inc | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter memorandum opinion and order. Plaintiff's motion [114-1, 114-2] and amended motions for sanctions and to disqualify [130-1, 130-2] are hereby denied. Motion hearing set for 11/5/01 is stricken.**

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | | |
| ✓ | Copy to judge/magistrate judge. | | | |

6
number of notices

NOV 0 7 2001
date docketed

docketing deputy initials

11/5/2001
date mailed notice

**Document Number**

2 2 3

SM
courtroom deputy's initials

Date/time received in central Clerk's Office

SM
mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| NORMAN JONES, et al. | ) |
|  | ) |
|     Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| SCIENTIFIC COLORS, INC., d/b/a APOLLO | ) |
| COLORS, INC., | ) |
|  | ) |
|     Defendant, | ) |
|  | ) |
| and | ) |
|  | ) |
| UNITED STATES EQUAL EMPLOYMENT | ) |
| OPPORTUNITY COMMISSION, | ) |
|  | ) |
|     Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| SCIENTIFIC COLORS, INC. d/b/a | ) |
| APOLLO COLORS, | ) |
|  | ) |
|     Defendant. | ) |

# 99C 1959

Case Nos. 99 C 1959/00 C 171

**Magistrate Judge Ian H. Levin**

[ ]
NOV 0 7 2000

## MEMORANDUM OPINION AND ORDER

Before the court is the Jones Plaintiffs Amended Motion for Sanctions and to Disqualify.

The subject motion concerns undercover investigations performed by Defendant (Apollo Colors) at its Rockdale, Illinois plant and the production of the reports of these investigations. Plaintiffs' threshold assertion is that Mr. Dan Kinsella and his law firm, Rooks, Pitts & Poust (Defendant's counsel) as well as Apollo's management directed covert undercover investigations of Apollo employees in which investigators made direct contact with two of Plaintiffs; namely,

*223*

Franklin Thompson and Douglas George. Plaintiffs argue that these direct contacts are in contravention of the Rules of Professional Conduct prohibiting contact with an individual represented by counsel. In addition, Plaintiffs assert that Defendant withheld the production of documents containing the reports of the covert investigations until May 23, 2001, when Defendant produced for the first time documents numbered 31167 to 32017. Pls.' Am. Mot. at 1-2.

In this motion, Plaintiffs' present four arguments.

(1) Plaintiffs' first argument is that Defendant violated the Rules of Professional Conduct by making contact with a person represented by counsel. Pls.' Am. Mot. at 2. Specifically, Local Rule ("LR") 83.54.2 provides:

> During the course of representing a client a lawyer shall not communicate or cause another to communicate [on the subject of representation] with a party the lawyers knows to be represented by another lawyer in that matter unless the first lawyer has obtained the prior consent of the lawyer representing such other party or as may otherwise be authorized by law.[1]

In addition, LR 83.58.4(a) provides that a lawyer shall not: (1) violate or attempt to violate the Rules of Professional Conduct; (2) induce another to engage in conduct, or give assistance to another's conduct, when the lawyer knows that conduct will violate these rules; (3) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; or (4) engage in conduct that is prejudicial to the administration of justice. *Id.* at 2-3.

Plaintiffs' cite case law indicating that the purpose of the professional responsibility rules stated, *supra*, is to prevent opposing counsel from taking advantage of the other party and to protect a party from the over-reaching of opposing counsel. *Blanchard v. Edgemark Fin. Corp.*, 175 F.R.D. 293, 301 & n.10 (N.D. Ill. 1997); Pls.' Am. Mot. at 3. In *Midwest Motor Sports, Inc. v. Arctic Cat*

---

[1]LR 83.54.2 is nearly identical to Rule 4.2 of the Illinois Rules of Professional Conduct.

*Sales,* 144 F.Supp.2d 1147, 1158 (D.S.D. 2001), the court recognized that , "[a] lawyer may not direct an investigative agent to communicate with a represented person in circumstances where the lawyer herself would be prohibited from doing so." (citations omitted).The court held that the undercover investigation conducted by attorneys for a litigant, which included direct contact with the opposing party, violated the Rules of Professional Conduct. (Pls.' Am. Mot. at 3-4.) Moreover, Plaintiffs cite *In the Matter of Searer,* 950 F.Supp. 811 (W.D. 1996) in which the District Judge herein interpreted Rule 4.2 of the Michigan Rules of Professional Conduct (quotation on page 4, Pls.' Am. Mot.).

(2) Plaintiffs' second argument is that Mr. Kinsella and his law firm wilfully violated the Rules of Professional Conduct by directing an investigation that included direct contact with Plaintiffs. Pls.' Am. Mot. at 4. Plaintiffs contend that beginning in January, 1999, Defendant and its attorneys initiated an investigation of Apollo employees. (Ex. B, Report of January 26, 1999). Pls.' Am. Mot. at 4. Defendant's counsel has described the investigation as follows:

> There's no question this was in anticipation of litigation. We were trying to develop a legal theory of defense at that time. That's why we hired these undercover employees, that why we got the reports. Very Simple. Ex. C (Transcript of Proceedings from April 3, 2001), p. 9. (Pls.' Am. Mot. at 4.)

On April 22, 1999, Plaintiffs' counsel warned Rooks, Pitts & Poust that, "I have been informed that Apollo is conducting interviews at the Rockdale Plant. Please be advised that we have not nor will we authorize any contact with our clients." Ex. D (copy of letter); Pls.' Am. Mot. at 5.[2] Despite the letter, Plaintiffs allege that Defendant and its counsel continued the undercover investigation. Pls.' Am. Mot. at 5. In addition, the investigators completed written reports and

---

[2]Plaintiffs allege they were not aware of the extent of the undercover investigation until May 23, 2001 when the documents were produced.

directed them to Mr. Kinsella and selected management at Apollo Colors.[3] *Id.*

Plaintiffs assert that the covert investigation targeted direct contact with Plaintiffs to obtain information and facts pertinent to their claims (namely, racially motivated graffiti and conduct). Pls.' Am. Mot. at 5. Plaintiffs cite to eight specific incidents where the investigative reports indicate that the investigator spoke with Plaintiffs Mr. George and/or Mr. Thompson. *Id.* at 5-6. For example:

> February 29, 2000: The investigation was re-initiated on 2/25/00, when our investigator arrived at the work place at 7:00 p.m. Our investigator talked to Doug (George) about the purchasing of drugs and he stated that he had been out of the business as of January 1, 2000. He told everyone in the room that he had stopped selling. Ex. G, p. 20534-20535. Pls.' Am. Mot. at 6.

Plaintiffs contend that Mr. Kinsella and his law firm met with investigators and were given verbal reports. Pls.' Am. Mot. at 7. Mr. Kinsella was also briefed by investigators during telephone conversations. Ex. P, p. 31491. (Pls.' Am. Mot. at 7.) Moreover, Defendant's billing statements reflect a four hour "client office meeting" on March 29, 2000. Ex. O, p. 20005 (Pls.' Am. Mot. at 7.) Plaintiffs, thus, argue that Defendant has the benefit of illegally obtained statements. Pls.' Am. Mot. at 7.)

(3) Plaintiffs third argument is that Defendant and its counsel concealed ethical violations, wrongly withheld documents, and produced a misleading and false privilege log. Pls.' Am. Mot. at 7. Plaintiffs state that Defendant wrongly withheld documents because Defendant responded to Plaintiffs' first request for production of documents ("[a]ll documents relating to all inquiries or investigations conducted as a result of each plaintiff's claim or allegation of discrimination" (par. 19)) by objecting based on work product and attorney-client privileges. Ex. R; Pls.' Am. Mot. at 7-8. Moreover, Defendant stated that "[it] has provided documents that it maintained in response to

---

[3]These reports were provided to management at their home addresses.

claims of discrimination that preceded plaintiffs' formal charges of discrimination as documents number 10784-13416." Ex. R; Pls.' Am. Mot. at 8. When Defendant supplemented its response to the first document request, it did not change its answer to paragraph 19. Ex. T; Pls.' Am. Mot. at 8.

Plaintiffs assert that Defendant's discovery responses are false and misleading because Defendant had thousands of pages of documents that were responsive to paragraph 19. Pls.' Am. Mot. at 8. Plaintiffs contend that Defendant withheld documents numbered 31167 to 32017 until May 23, 2001 and provided a false and misleading privilege log because the May 31, 2001 log omitted reference to document numbers 31167 to 32017. Pls.' Am. Mot. at 8. Plaintiffs, therefore, assert that Defendant and its counsel are subject to sanctions under Rule 37(b)(2) for withholding documents and producing a misleading and false privilege log. Pls.' Am. Mot. at 9,16 (sanctions listed on page 9). (Rule 26(b)(5) requires the disclosure of documents for which a privilege is claimed.) *Id.* at 9.

(4) Plaintiffs' fourth argument is that Mr. Kinsella and his law firm should be disqualified and otherwise sanctioned due to their wilful violation of LR. 83.54.2 (plus Plaintiffs' counsel did not authorize Defendant to have any contact with their clients). Ex. C (Transcript of April 3, 2001), p. 10; Ex. D; Pls.' Am. Mot. at 10. Plaintiffs' argue that sanctions are warranted because of the court's July 10, 2001 order, specifically finding that "Attorney Kinsella has acknowledged that the undercover investigation was initiated at his instance." Order at 3. Pls' Mot. at 2, 10. Moreover, the court further recognized that "Mr. Kinsella was involved in directing the investigation." *Id.* Plaintiffs, further, contend that because Defendant and its counsel willfully withheld investigative reports, concealed their ethical violations for two years, and made misrepresentations regarding the

covert investigation, sanctions should be imposed on Defendant and its counsel. Pls.' Am. Mot. at 10.

Plaintiffs argue that disqualification is necessary to restore integrity to the case and ensure a just and fair trial. Pls.' Am. Mot. at 10. Plaintiffs cite to case law instructing that "[d]isqualification may be ordered as a remedy for a violation of Rule 4.2." *Weeks v. Independent Sch. Dis. No. I-89*, 230 F.3d 1201, 1211 (10th Cir. 2000) (citations omitted); Pls.' Am. Mot. at 10-11. According to another court, an attorney should be disqualified for violating the rules of professional conduct "when the integrity of the adversarial process is at stake." *Papanicolaou v. Chase Manhattan Bank*, 720 F.Supp. 1080, 1083 (S.D.N.Y. 1989)(*citing Bd. of Ed. v. Nyquist*, 590 F.2d 1241, 1246 (2nd Cir. 1979)); Pls.' Am. Mot. at 11. The court reasoned:

> Although breaches of Model Rule 4.2 might not necessarily require disqualification, courts considering violations of the Rule cannot abdicate their roles as guarantors of fair process. If a lawyer's violation of Model Rule 4.2 might taint the trial, the lawyer should be disqualified. *Id.* at 1084; Pls.' Am. Mot. at 11.

The court also recognized that where information obtained in violation of Rule 4.2 goes to the heart of a lawsuit, an attorney had to be disqualified "to protect [the adverse party] from any unfair advantage [they] might have achieved by the improper meeting." *Id.* at 1085 (citations omitted); Pls' Am. Mot. at 11.

Plaintiffs assert that Mr. Kinsella and his law firm gained an unfair advantage by virtue of information that they obtained with respect to Plaintiffs through the undercover investigations. Pls.' Am. Mot. at 11. Plaintiffs argue that the evidence obtained in violation of Rule 83.54.2 goes to the heart of the lawsuit. *Id.* Plaintiffs, thus, argue that because they do not know the extent of the information Defendant and its counsel obtained as a result of the investigations, that nothing short

of disqualification can "protect [Plaintiffs] from any unfair advantage [Mr. Kinsella, Pitts & Poust] might have achieved by the improper meeting(s). *Nyquist*, 590 F.2d at 1246.

Plaintiffs argue that Defendant's affirmative defense that it ". . . exercised reasonable care to prevent and promptly correct harassing behavior and that Plaintiffs reasonably failed to take advantage of the preventive and corrective opportunities or to avoid harm otherwise" should be stricken pursuant to Rule 37(b)(2). Pls.' Am. Mot. at 12; Ex. V(Amended Answer and Affirmative Defenses), p. 33, par. 7. Plaintiffs assert that the affirmative defense should be stricken because Defendant and its counsel impaired Plaintiffs' ability to conduct discovery and prepare their case by withholding documents and creating a false privilege log. Pls.' Am. Mot. at 12. Plaintiffs deposed Defendant's employees without a full understanding of the evidence. *Id.* Moreover, the information pertinent to Defendant's affirmative defense was not produced until eight days prior to the close of discovery. *Id.* Plaintiffs, therefore, assert that striking Defendant's affirmative defense pursuant to Rule 37(b)(2)(C) is an appropriate sanction. *Id.* at 12-13. *Crown Life Ins. Co. v. Craig*, 995 F.2d 1376 (7th Cir. 1993)(court upheld default judgment for wilful violation of discovery rules).

Plaintiffs contend that Defendant and its counsel should be ordered to pay for all discovery. Pls.' Am. Mot. at 13. Plaintiffs assert that they did not have the investigative reports (produced on May 23, 2001) containing racially motivated and discriminatory comments when they conducted depositions of Defendant's management, former employees, and experts. Pls.' Am. Mot. at 13-14. Plaintiffs cite to nine incidents of racially motivated and discriminatory conduct identified in the reports that they were not aware of when they completed discovery. *Id.* Plaintiffs assert that pursuant to Rule 37(b)(2), they should be awarded attorney's fees and costs for all depositions taken to date. *Id.* at 14-15. In addition, Plaintiffs assert that Defendant should be liable for all continuing discovery

costs. *Id.* Plaintiffs also request additional time to conduct discovery (discovery cutoff was June 1, 2001) to name additional witnesses, supplement experts' reports, etc. *Id.* 15-16.

Plaintiffs argue that any evidence obtained in violation of Rule 83.54.2 (e.g., information improperly withheld and falsely concealed, Plaintiffs' statements to investigators, any information conveyed to Defendant and its counsel), and not produced until May 23, 2001 should not be introduced. Pls.' Am. Mot. at 15. Plaintiffs, therefore, assert (1) that Defendant should be sanctioned under Rule 37(b)(2)(B) for withholding documents and producing a misleading and false privilege log (asserted, *supra,* in argument (3), and (2) that additional sanctions (listed on p.17) should be imposed by the court. Pl.'s Am. Mot. at 17.

I.  *Defendant's Memorandum in Opposition to Plaintiffs' Amended Motion for Sanctions and to Disqualify.*

Defendant asserts that Plaintiffs' amended motion ignores or intentionally overlooks numerous facts and circumstances that they either knew about or should have known about. Def.'s Mem. at 2. For instance, Plaintiffs were aware of the May 24, 2001 deposition of Mr. Perry Myers, the owner of the detective agency, Myers Service, Inc. ("Myers") who performed the undercover investigation. *Id.* Defendant asserts that, in his deposition, Mr. Myers demonstrated that there was no factual basis for the Plaintiffs' statements concerning Mr. Kinsella. *Id.* Defendant also contends that Plaintiffs never took depositions of any other individuals who performed the undercover investigations. *Id.* Moreover, Plaintiffs fail to mention that the undercover reports were disclosed before May 23, 2001 when Defendant asserted a work product privilege regarding them. *Id.* The District Judge, however, subsequently, found a waiver of the work product privilege based on one of Defendant's affirmative defenses, and subsequently, after the court's in camera inspection, the

undercover reports were produced on May 23, 2001. *Id.*

*Undercover Investigation*

The undercover investigation began in later 1998 or early 1999 when Mr. John Ott, Apollo's Human Resource Director contacted Mr. Myers to set up a meeting to discuss investigative work. Ex. A p. 8, 20-21; Def.'s Mem. at 3. At the initial meeting, Mr. Myers met with Mr. Ott, Mr. Tom Rogers, Apollo's President, and Mr. Bruce Wright, Apollo's Vice-President. The purpose of the meeting was to discuss the racist activities at Apollo and the drug use going on at the Rockdale plant. Def.'s Mem. at 3-4. The Apollo officers decided that Myers would provide undercover investigators who would work as if they were Apollo employees. *Id.* at 4. Mr. Myers testified that other than a description of the incidents that occurred at Apollo, he was not given guidance as to how the investigation should be directed. Ex. A, p. 51; Def.'s Mem. at 4. Furthermore, Mr. Kinsella was not present at this meeting. Ex. A, pp. 20-22; Def.'s Mem. at 3.

Myers performed undercover investigations during two different time periods: 1999 (January and February) and 2000 (January and February through August). Ex. A, pp. 46, 49, 66-67; Def.'s Mem. at 4. Mr. Myers testified that in addition to the initial meeting, he had spoken with Mr. Ott (six or seven times), Mr. Wright (two to four times) and Mr. Rogers (one time). Ex. A, pp. 89-92; Def.'s Mem. at 4. Mr. Myers testified that he spoke with Mr. Kinsella in late 1998, early 1999:

> Q. Okay. What was the nature of that initial conversation? What did he say to you and what did you say to him?
> A. Again it would have been more towards the focus of the investigation, what we needed to look for, kind of things we needed to uncover, some of the legalities of what we were doing, making sure that we were aware of the issues and - -
> Q. What was the focus of the investigation as explained to you by Mr. Kinsella?
> A. To determine who was using or who was writing the graffiti and doing the racial graffiti and other signs at the company.
> Q. And in the conversation with Mr. Kinsella, <u>were you directed to</u> any parts of the

plant, <u>any individual</u> who were more likely to give useful information or who were suspects, anything of that nature?

A.  <u>Not that I could recall.</u>  I think it was a pretty open, you know, keep your eyes open it could be anyone kind of an approach to this, so <u>I don't recall that specific individuals were named.</u>

Q.  Other then that original conversation where you are given direction from Mr. Kinsella to look for who was behind the racial graffiti and to take a general approach, were you ever given any different direction by Mr. Kinsella?

A.  You mean change the direction of the focus of the undercover?

Q.  Correct.

A.  No, not that I can recall. (Ex. A, pp. 94-95 (underscoring added)).

The undercover investigator who worked at Apollo from February, 2000 through August, 2000 was Mr. Dorsey Williams.  Def.'s Mem. at 6.  Mr. Williams spoke with Mr. Kinsella at a meeting in February, 2000, (Mr. Ott was also present), but neither Mr. Kinsella nor Mr. Ott mentioned the names of any individuals whom Mr. Williams should talk to or gather information about. *Id.*

Several weeks after the February, 2000 meeting, Mr. Ott contacted Mr. Williams and told him that there was information that Plaintiff, Mr. George, was selling drugs in the workplace. Def.'s Mem. at 6. Mr. Williams spoke with Mr. George about purchasing drugs and then later, about other matters. Ex. B, par. 6; Def.'s Mem. at 6.

In May, 2000, Mr. Marty Mroz, Myers' director of outside investigations, informed Mr. Williams that there had been a vandalism incident in connection with Plaintiff, Mr. Thompson's locker that involved racial overtones. Def.'s Mem. at 6. Mr. Ott provided the information regarding Mr. Thompson directly to Mr. Mroz via a May 26, 2000 fax which was, subsequently, passed on to Mr. Williams. Ex. C, par. 7; Def.'s Mem. at 7. Mr. Williams spoke with Mr. Thompson regarding the incident. Def.'s Mem. at 6. Mr. Mroz, however, did not meet with or communicate with Mr. Kinsella regarding this incident or any other part of the investigation. Ex. C, par. 6; Def.'s Mem.

10

at 7.

Defendant argues that the individuals, who were involved in the investigation in the year 2000, confirm that Mr. Kinsella never directed that specific individuals; namely, Mr. George and Mr. Thompson, should be spoken to or contacted. Def.'s Mem. at 7. Moreover, Apollo's management was deposed and testified that the decision to hire outside investigators was made to ascertain if there was any wrongdoing taking place within the plant (e.g., thefts, incidents of racial discrimination, drug activity, etc.). Def.'s Mem. at 7. Furthermore, at his deposition, President Rogers testified:

> Q.    Whose idea was it to hire professional investigators?
> A.    It may have been mine. We discussed it collectively and talked about what we could do. (Ex. F, pp. 131-32.)

*Reports of the Undercover Investigation*

Defendant asserts that it disclosed the existence of the undercover investigation in its amended responses to Plaintiffs' first request for production of documents (which also included a letter, dated April 23, 1999, from Mr. Rogers to the FBI stating that in response to racial graffiti, Apollo had hired undercover investigators) no later than February 7, 2000 (not May 23, 2001). Exs. H, I; Def.'s Mem. at 8-9. Defendant, however, raised an objection (work product) to producing all documents relating to investigations conducted "as a result of each plaintiffs' claim or allegation of discrimination." Ex. H, par. 19; Def.'s Mem. at 9. Defendant contends that it produced numerous documents (thousands of pages) of its internal investigations and that the undercover investigation was extraordinary and not considered by Defendant when it responded to Plaintiff's first request for production. *Id.*

Defendant asserts that as subsequent discovery took place, it responded to other requests by objecting to the production based on the work product privilege (i.e., Plaintiffs' second request for

production) and by determining whether the request was subject to production (i.e., information regarding the investigation of racial graffiti - Mr. Rogers's letter to FBI). Ex. N, par. 4; Ex. O, par. 2, p. 2; Def.'s Mem. at 10. In addition, in January, 2001, the EEOC wrote to Defendant requesting documents relating to the hiring of covert operatives stating that those documents came within the production of documents relative to "security related services." Ex. Q; Def.'s Mem. at 10. Defendant's attorney responded stating that the covert investigation was conducted in response to the allegations in the complaint; therefore, Defendant was protected by the work product privilege. Def.'s Mem. at 10. The EEOC brought a motion to compel production of the undercover investigation reports, but this court denied the motion (work product privilege) and ordered Defendant to complete a privilege log. *Id.* at 11. On March 23, 2001, Defendant produced a privilege log. Ex. T; Def.'s Mem. at 11.

On April 3, 2001, the EEOC presented a motion for rehearing seeking production of the undercover investigation reports. Def.'s Mem. at 11. The motion was denied and the EEOC attorneys filed objections. *Id.* On May 14, 2001, the District Judge found that the undercover investigation reports must be produced but only after this court conducted an in camera inspection. *Id.* On May 23, 2001, following the court's inspection, Defendant produced the reports to Plaintiffs. *Id.*

In responding to the subject motion, Defendant presents four arguments:

(1)   Defendant asserts that Mr. Kinsella never communicated or caused another to communicate with Plaintiffs Mr. George and/or Mr. Thompson. Def.'s Mem. at 12. Defendant asserts that Plaintiffs allege that Mr. Kinsella violated the ethics rules solely because undercover investigative reports dated February 29,  March 7 and 23, April 27, May 30, June 21, July 6, and

August 28, 2000 mention that Investigator Williams had contact with Mr. George and Mr. Thompson. Def.'s Mem. at 13. Plaintiffs, thus, claim that Defendant (Mr. Kinsella) violated LRs 83.54.2 and 83.58.2 when Mr. Williams spoke or communicated with Mr. George and Mr. Thompson. *Id.*

Defendant argues that while Mr. Kinsella had some discussions with Apollo regarding the undercover investigation, he had only limited discussions with Myers employees as to the general nature of the investigation. Def.'s Mem. at 13. Defendant contends that Mr. Kinsella never directed or caused any undercover investigator to communicate with a party. *Id.* In addition, no allegation has been made that Mr. Kinsella ever communicated with a party outside the presence of the parties' attorney. *Id.* Furthermore, the investigative personnel have testified that neither Mr. Kinsella nor anyone from his law firm ever told any investigator to contact or communicate with Mr. George, Mr. Thompson, or any other Plaintiffs who were represented by attorneys. Ex. A, pp. 110-111, 120; Ex. B, pars. 5,8; and Ex. C, pars. 6, 8; Def.'s Mem. at 14.

Defendant, thus, asserts Plaintiffs' charge is based solely on Mr. Kinsella's statement that the undercover investigation was done at his instance and that Mr. Williams spoke with Mr. George and Mr. Thompson. Def.'s Mem. at 14. Defendant asserts that Plaintiffs have not deposed Mr. Williams. Ex. E, p. 36; Def.'s Mem. at 14. Moreover, Plaintiffs have not deposed Investigator Mroz who would have testified that he had never spoken to nor communicated with Mr. Kinsella during the course of the investigation. Ex. B; Def.'s Mem. at 15. Furthermore, if Mr. Mroz and Mr. Williams would have been deposed, Plaintiffs would have learned that Mr. Ott, not Mr. Kinsella, provided Myers investigators with Mr. George and Mr. Thompson's names. Ex. B, C; Def.'s Mem. at 14.

(2) Defendant's second argument is that Mr. Kinsella acted ethically in recommending to
Apollo that an undercover investigation be conducted to seek out discriminatory and/or illegal
activity. Def.'s Mem. at 15. Defendant asserts that it is permissible for an attorney to advise a client
to perform an undercover investigation. *Id.* In addition, an attorney may properly advise a client as
to whether the client may communicate with an adverse party either directly or through a hired
investigator. *Id.* Defendant, thus, asserts that parties to a matter may communicate directly with each
other. Comment to LR 83.54.2.

In *Miano v. AC&R Advertising, Inc.*, 148 F.R.D. 68 (S.D.N.Y. 1993), a plaintiff recorded
damaging statements from a corporate defendant employee, which were provided to plaintiff's
attorney who eventually produced them in litigation. The defendant claimed that the plaintiff's
attorney violated the equivalent of LR 83.54.2, by communicating with persons represented by
counsel. As stated in *Miano:*

> Ethics opinions allow that attorneys need not prevent clients from engaging in ex
> parte or taped conversation with adversaries, and are permitted to counsel clients
> regarding the scope and ramifications of such conduct. . .While the attorney's
> subsequent receipt and use of information secured by the client goes a step further,
> logic dictates that if the information was not secured illegally or unethically, its use
> does not place the attorney in violation of the disciplinary rules. . .When a client
> independently and legally secures information which is relevant and useful to his case
> and provides it to counsel, the attorney's use of the information is not unethical." *Id.*
> at 89 (citations omitted).

In *EEOC v. McDonnell Douglas Corp.*, 948 F.Supp 54, 55 (E.D. Mo. 1996), in construing
the Missouri equivalent of LR 83.54.2, the court ruled that "there is nothing that prohibits one party
to a litigation from making direct contact with another party to the same litigation." *See Hazard &*
*Hodes, The Law of Lawyering*, § 38.4 at 38-5: "Rule 4.2 is designed to prevent lawyers from either
overreaching third parties or interfering with the relationships between opposing parties and their

own lawyers. It follows that the Rule does not (and could not in any event) prevent one party from directly communicating with another. Furthermore, a lawyer should be able to advise a client to contact a third-party even a represented third-party - directly, without running afoul of the prohibition in rule 8.4 against violating a disciplinary rule through the acts of another." *Id.*

Section 99 of the Restatement (3rd) of Law Governing Lawyers has a rule similar to LR 83.54.2 stating that "[n]o general rule prevents a lawyer's client, either personally or through a non-lawyer agent, from communicating directly with a represented nonclient. Thus, while neither a lawyer nor a lawyer's investigator or other agent . . . may contact the represented nonclient, the same bar does not extend to the client of the lawyer or the client's investigator or other agent. As stated in Subsection (2), the anti-contact rule does not prohibit a lawyer from advising the lawyer's own client concerning the client's communication with a represented nonclient, including communications that may occur with the prior consent. . . or knowledge of the lawyer for the non-client. The lawyer for a client intending to make such a communication may advise the client regarding legal aspects of the communication, . . . " *Id.* at 76-77.

Defendant argues that based on the rules and case law discussed, *supra,* Mr. Kinsella could have ethnically advised Apollo on the performance of the undercover investigation and he could have, without violating, LR 83.54.2 advised Apollo that it directly or through Apollo's investigator, Myers could contact Plaintiffs herein. Def.'s Mem. at 17. Defendant asserts, however, that, in any event, the information provided to Mr. Williams regarding the contacts with Mr. George and Mr. Thompson came from Mr. Ott, and not from Mr. Kinsella. Exs. B, C; Def.'s Mem. at 17. Moreover, while the decision whether or not to perform the investigation was discussed with Mr. Kinsella, the decision to proceed was made by Apollo's President, Mr. Rogers. Def.'s Mem. at 17. Furthermore,

the meeting between Mr. Myers and the Apollo representatives regarding what would be done did not include Mr. Kinsella. Ex. A, pp. 20-22; Def.'s Mem. at 17.

(3) Defendant's third argument is that disqualification is unwarranted (too harsh) even assuming, *arguendo*, that Mr. Kinsella caused the investigator to communicate with any of the Plaintiffs. Def.'s Mem. at 18. In considering disqualification, courts typically follow a two-step process. A court must determine whether an ethical violation has occurred, and if disqualification is the appropriate remedy. *SWS Fin. Fund A. v. Salomon Bros., Inc.,* 790 F.Supp. 1392, 1399 (N.D. Ill. 1992). In addition, the moving party bears the burden of showing facts necessitating disqualification. *Evans v. Artek Sys. Corp.,* 715 F.2d 788, 794 (2d Cir. 1983). Moreover, attorney disqualification "is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 721 (7th Cir. 1982).

In response to Plaintiffs' citation to case law where disqualification of counsel was ordered, Defendant asserts that, in these cases, the attorney had communicated with the opposing party, and a finding of significant prejudice was made by the court. Def.'s Mem. at 18. In each case cited by Plaintiffs, there was an intentional and egregious violation by a particular attorney. *Id.* at 18-19. *See* Def.'s Mem. at 19 for individual case synopsis.

Defendant also asserts that Plaintiffs have not been prejudiced by Mr. Williams communicating with Mr. George and Mr. Thompson because the information about former drug sales is outside "the subject of the representation" of the suit, and the information about who hung the noose and made racial remarks is no different than information provided by other witnesses, including Plaintiffs. Def.'s Mem. at 20. Thus, Defendant contends that disqualification is not the appropriate remedy because Plaintiffs have not been prejudiced. *Id.*

(4) Defendant's fourth argument is that sanctions are not appropriate with respect to the undercover investigation reports, the claim of work product privilege and the privilege logs. Pls.'s Mem. at 21. Defendant argues that it did not violate the Rules of Professional Conduct or the Federal Rules of Civil Procedure by raising the work product objection as to the undercover investigation reports. Def.'s Mem. at 22. Defendant states that although the reports were not detailed in the May, 2000 privilege log, Plaintiffs were aware of their existence and the reports were detailed in the March 31, 2001 log. *Id.* In addition, the fact that the reports were not detailed in the May, 2000 log was not done to mislead anyone, but was at most an inadvertent oversight, even if, Plaintiff's request for documents are construed as relating to investigations conducted, "as a result of each Plaintiff's claim or allegation of discrimination." Ex. H., par. 19; Def.'s Mem. at 22.

Defendant alleges that it never hid any information concerning the undercover investigation and, in fact, Plaintiffs were aware of it from the beginning. *Id.* Defendant asserts that a court typically imposes sanctions only when a party fails to comply with discovery by displaying willful conduct, bad faith or fault. *See Philips Medical Sys. Intern., B.V. v Bruetman*, 982 F.2d 211, 214 (7th Cir. 1992) (citation omitted). Defendant, thus, alleges that it repeatedly raised valid objections which were upheld twice, and even when the District Judge ordered the reports produced, the court acknowledged that the reports were work product, but found the privilege waived based on one of Defendant's affirmative defenses. *Id.* In addition, Defendant promptly complied with the District Judge (and this court's order) regarding the privilege log. *Id.*

Defendant, thus, argues that the facts and evidence shown by deposition testimony and affidavits conclusively establish that neither Mr. Kinsella nor his law firm violated LRs 83.54.2 and 83.58.4. Def.'s Mem. at 22. Mr. Kinsella acted properly at all times. *Id.* Furthermore, Defendant,

in good faith, continually raised the work product privilege regarding the undercover investigation reports, made Plaintiffs aware of the undercover investigation beginning February 7, 2000, and provided a privilege log on March 23, 2001. *Id.* The fact that the reports weren't detailed in the May, 2000 privilege log was not intentional. *Id.* Defendant, therefore, asserts that disqualification/sanctions are not appropriate. *Id.*

II.    *Plaintiffs' Reply in Support of Amended Notice for Sanctions and to Disqualify.*

In this motion, Plaintiffs present five arguments. Most of these arguments are similar to those presented in Plaintiffs' opening brief.

(1) Plaintiffs allege that the testimony offered by Defendant has been misstated and does not establish compliance with the Rules of Professional Conduct. Pls.' Reply at 3. Specifically, Plaintiffs state that Defendant and its counsel now contend that "the actual decision to proceed (with the investigation) was made by Mr. Rogers, President of Apollo." Def.'s Mem. at 17. Defendant also claims that the "[t]he undercover investigation . . . was not conducted as a result of each plaintiffs' claim or allegation of discrimination." *Id.* at 9. Plaintiffs, however, assert that the actual testimony of Mr. Rogers is that hiring the investigators "may" have been his idea. Def.'s Ex. F, p. 132; Pls.' Reply at 3. Mr. Rogers stated during his deposition:

Q.    You didn't do (the investigation) simply because there was a lawsuit pending? Is that true?
A.    This happened before the lawsuit. *Id.*

Plaintiffs argue that Mr. Rogers's testimony cannot be reconciled with the statements made by Mr. Kinsella and Mr. Miller, who offered a different story when attempting to establish a work product privilege. Pls.' Reply at 3. For example, Mr. Kinsella advised the court that the undercover investigation was done in anticipation of litigation in order to develop a legal theory of defense. Ex

C, pp. 9-10, Pls.' Am. Mot. (*See* Transcript of Proceedings from April 3, 2001); Pls.' Reply at 4. In addition, in a January 30, 2001 letter, Mr. Miller of Rooks, Pitts & Poust stated that "[w]e may have hired these individuals [investigators] as part of our investigation into the allegations of this complaint. As such, they are protected by the attorney/work product privilege." Def.'s Ex. R; Pls.' Reply at 4. Furthermore, Plaintiffs assert that Mr. Rogers's testimony is inconsistent with Judge McKeague's July 9, 2001 order because he found that, "[a]ttorney Kinsella has acknowledged that the undercover investigation was initiated at his instance." Ex. 1, p. 3; Pls.' Reply at 4.

Plaintiffs next argue that the investigators statements (Mr. Myers and Mr. Mroz) do not conclusively establish compliance with the ethics rules. Pls.' Reply at 4. In its response, Defendant and its counsel claim that "Mr. Myers's deposition testimony [is] that Mr. Kinsella did not direct or cause anyone from Myers to contact or communicate with any individual at Apollo." Def's. Mem. at 14. However, on May 24, 2001, Mr. Myer testified that he could "not recall" whether he was directed to investigate any specific individual. *Id.* Plaintiffs assert that, with respect to Mr. Mroz, Defendant claims that, "Mr. Mroz never met with nor spoke with Mr. Kinsella, *nor communication with Mr. Kinsella in any fashion* with regard to the undercover investigation." Def.'s Mem. at 7. Plaintiffs point out, however, that Mr. Mroz authored all of the investigative reports that were sent directly to Mr. Kinsella." Pls.' Exs. J, L, M, and N (Am. Mot.); Pls.' Reply at 5.

Plaintiffs also assert that Mr. Kinsella has not submitted an affidavit. Pls.' Reply at 5.

(2) Plaintiffs' second argument is that Mr. Kinsella directed the investigation. Pls.' Reply at 5. Plaintiffs contend that Defendant and its counsel are attempting to minimize Mr. Kinsella's and his law firm's involvement by claiming that, "Mr. Kinsella acted ethically in recommending to his client that an undercover investigation be conducted to seek out discriminatory . . . activity." Def.'s

19

Mem. at 15. Plaintiffs, however, assert that Mr. Kinsella merely "recommended . . . that an undercover investigation be conducted" is contrary to Mr. Kinsella's prior statements and Judge McKeague's findings that Mr. Kinsella was "actively involved in directing the investigation." Ex.1, p. 3; Pls.' Reply at 6.

Plaintiffs assert that the court should reject Defendant's claim that "[t]he meeting between Mr. Myers and the Apollo representatives as to what was desired and what was to be done did not include Mr. Kinsella." Def.'s Mem. at 17. The claim should be rejected because Mr. Myers testified that he spoke on the telephone with Mr. Kinsella in late 1998, early 1999 about "the focus of the investigation, what we needed to look for, kind of things we needed to uncover . . . making sure we were aware of the issues . . . " Def.'s Ex. A, pp. 94-95; Pls.' Reply at 6. Mr. Myers, also, testified that Mr. Kinsella was his client. Ex. 2, p. 6. Moreover, Defendant's second privilege log identifies five handwritten notes reflecting various conversations between the investigator and Mr. Kinsella. Ex. T; Pls.' Reply at 6-7. The privilege log includes references to documents indicating "a reference from Dan Kinsella" and a conversation with Mr. Kinsella "regarding the scope and content of the investigative reports." Pls.' Reply at 7.

Plaintiffs argue that Defendant's attempt to compare the circumstances in this case to those involving mere communication between clients fails. Pls.' Reply at 7. For example, in *Miano*, 148 F.R.D 68, the court found that those individuals contacted surreptitiously by a party were not represented by counsel. Second, the court stated that the attorney in question "did not engineer or arrange" the taped conversations. *Id.* at 88. The court further found that the attorney "did not suggest, plan or supervise what [the client] was doing . . . " *Id.* at 89. The court, however, did conclude that the attorney was "perilously close to crossing the line of circumventing the disciplinary

rules through his client." *Id.*

Plaintiffs argue that Defendant's argument disregards the language, in *Miano*, which discusses whether an attorney has "caused" a communication with a party who is represented by counsel. Pls.' Reply at 7. The court in *Miano* stated:

> Obviously, when an attorney actually requests or engineers a contact or action by another that would otherwise be prohibited by the disciplinary rules, he . . . can be deemed to have "caused" it and to have circumvented the rule. An attorney cannot legitimately delegate to another what he himself is prohibited from doing, nor may he use another as to his alter ego. . . [T]he constraints on an attorney must go even further, so as to address the situation where he or she goes not explicitly instruct another to act but accomplishes the same result indirectly. *Id.* at 82; Pl.'s Reply at 7.

Plaintiffs, thus, assert that Defendant and its counsel have done precisely what *Miano* says the rules prohibit, "engineering a contact or action by another that would otherwise be prohibited by the disciplinary rules. . ." *Miano*, 148 F.R.D at 82. For example, Mr. Kinsella received frequent reports from investigators for the purpose of manufacturing a defense. Pls.' Reply at 8. Defendant's privilege log identifies multiple contacts between Mr. Kinsella and the investigators. *Id.* Plaintiffs assert that the status reports clearly indicate that investigators were targeting them directly and seeking information about the case. *Id.* Moreover, notwithstanding Mr. Kinsella's knowledge of direct contact with Plaintiffs, he did nothing to change the direction or focus of the investigation. *Id.* at 9.

(3) Plaintiffs' third argument is that Defendant provides no reasonable justification for why it failed to disclose the investigative reports for over two years. Pls.' Reply at 9. Plaintiffs argue that Defendant deliberately failed to disclose the investigative reports despite numerous requests for production. *Id.* at 10. The chronology of requests for production is as follows:

In April, 1999, Plaintiffs' First Production Request sought "all documents relating to all injuries or investigations conducted as a result of each Plaintiff's claim or allegation of discrimination." *Id.*

Plaintiffs assert that Defendant's contention that the investigative reports were not responsive to this request contradicts Mr. Kinsella's assertion that the investigation was an effort to develop a legal theory of defense.

On March 28, 2000, Plaintiffs' counsel requested all information and documents relative to Mr. Rogers's letter to the FBI. Ex. I to Def.'s Mem.

Plaintiffs assert that Defendant failed to disclose the existence of the reports and now Defendant contends that Plaintiffs knew about the reports when it produced Mr. Rogers's letter. However, the letter, like Defendant's May 31, 2000 privilege log, makes no reference to the reports. Furthermore, Plaintiffs made multiple requests for documents supporting Mr. Rogers's letter, but Defendant continued to conceal the reports.

On April 26, 2000, Plaintiffs served their second request for production of documents seeking information "related to or showing investigations conducted by Defendant into the identity of the person(s) responsible for racially-offensive graffiti." *Id.*

On May 31, 2000, Defendant submitted its misleading and false privilege log that made no reference to the investigative reports. *Id.*

On September 5, 2000, Plaintiffs, again, requested all documents and information relating to Mr. Rogers's letter to the FBI. *Id.* (Ex. N to Def.'s Mem.)

On September 11, 2000, Defendant's counsel submitted its false response to Plaintiffs' September 5, 2000 letter, stating, that "we have not received additional documentation from the client." *Id.* at 11.

Plaintiffs argue that Defendant's response is deliberately misleading because on September 11, 2000, Mr. Kinsella had in his possession multiple investigative reports. *Id.*

On September 19, 2000, Defendant's response to Plaintiffs' second request for production, again, deliberately mislead Plaintiffs by stating, "[w]ithout waiving the

22

foregoing (work production and attorney/client privilege) objection, Defendant has produced documents responsive to this request which exist since January 1, 1997 to date, and which are documents 13813-13883 . . . " Ex. P, Def.'s Mem.

Plaintiffs assert that Defendant's response is once again deliberately false and misleading because Mr. Kinsella had numerous investigative reports in his possession well before September 19, 2000 which had not been produced. *Id.*

Plaintiffs, therefore, request that the court impose sanctions on Defendant due to its pattern of deception and willful failure to identify the investigative reports. Pl.'s ' Reply at 12. Plaintiffs assert that it was prejudiced by Defendant's conduct because it incurred significant time and expense in repeatedly requesting the investigative reports and proceeding with depositions without the benefit of the reports. *Id.*

(4) Plaintiffs argue that Mr. Kinsella and his law firm should be disqualified and otherwise sanctioned. Pls.' Reply at 12. In this section, Plaintiffs restate its arguments for disqualification and add that Defendant, in its response, does not address the fact that Mr. Kinsella and his firm directed an investigation in violation of LRs 83.54.2 and 83.58.4(a), and that Defendant provides no justification for its failure to stop or change the scope of the investigation. *Id.* at 13.

(5) Plaintiffs assert that other sanctions are warranted for counsel and Defendant's egregious conduct. Pls.' Reply at 14. In this section, Plaintiffs restate the additional proposed sanctions listed in its opening brief. Pls.' Reply at 14-15; Pls.' Am. Mot. at 17.

## THE COURT'S FINDINGS

Initially, the court determines that the evidence in the record (and the state of the record) does not adequately establish that Mr. Kinsella or his firm either communicated or caused the undercover investigators to communicate with Plaintiffs Thompson and George in violation of Local Rules

83.54 and 83.58, so as to warrant the "drastic" sanction of attorney disqualification. Moreover, even assuming *arguendo* a Rule 83.54 (and/or Rule 83.58) violation(s) herein, the state of the record is such that the court cannot find the necessary wilful or intentional violation, and prejudice to Plaintiffs, essential to an order of attorney disqualification.

Similarly, the court determines that the evidence presented of record does not adequately establish that Defendant and its counsel concealed ethical violations, wrongfully withheld documents, and produced a misleading and false privilege log. The record before the court, and considering Defendant's arguments and position, does not show the type of wilful or bad faith conduct or fault requisite to such a finding.

## CONCLUSION[4]

In view of the foregoing, the Plaintiff's Amended Motion for Sanctions and to Disqualify is denied.

ENTER:

**IAN H. LEVIN**
**United States Magistrate Judge**

Dated: November 5, 2001

---

[4]In view of our findings herein, the court finds it unnecessary to consider the various sanctions alleged by Plaintiffs to flow from the violations asserted.

24